### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No.: 21-CR-50 (CJC)** |
| **JASON LEE HYLAND,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| _____ | **:** | |

### DEFENDANT'S SENTENCING MEMORANDUM

Jason Lee Hyland, by counsel, respectfully submits this Sentencing Memorandum in support of his requested sentence of 12 months' probation, community service, a fine of up to $5,000 and restitution of $500.

On March 28, 2022, Mr. Hyland pled guilty to Count 4 of the Second Superseding Indictment charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  The maximum punishment is 6 months imprisonment and/or a $5,000 fine.  This Court sentenced codefendant, Jennifer Ryan, to 2 months' incarceration, $1,000 fine, and $500 restitution.  Katherine Staveley Schwab is scheduled for a plea agreement hearing on August 18, 2022.

Mr. Hyland recognizes the gravity of his involvement at the Capitol on January 6th, the tragic loss of life, the injury caused to the democratic process, and the responsibility he bears for his role in the attack on the institutions of government.  The events of January 6th quickly convinced him that the election was not stolen and that his presence at and inside the Capitol was not only extremely dangerous but un-American.  He respectfully requests a sentence of 12 months' probation without home detention, 30 hours of community service, a fine of up to $5,000, in an amount to be determined by the Court, and restitution of $500.  Reasons supporting

this request include: (1) Mr. Hyland's conduct before and after the riot; (2) his early acceptance of responsibility and voluntary cooperation with the F.B.I. (January 19, 2021), during which he was truthful and made no attempt to minimize his conduct; (3) not engaging in, or celebrating any form of violence or destruction of property; (4) his nonconfrontational interaction with law enforcement; (5) his short-lived presence inside the Capitol - Mr. Hyland remained inside the Capitol for roughly 2-3 minutes, stood and recorded videos at the Capitol Plaza East entrance to the building, and exited immediately after observing a physical altercation between officers and other rioters on the opposite side of the room; (5) his lack of a criminal history; (6) a successful record of 16 months of pre-trial supervision; (7) no posting of public online commentary before, during or after January 6, and no prior similar involvement; (8) his early and unconditional expressions of remorse; and (9) his personal history and circumstances.  For these and other reasons explained below, a sentence of probation without home detention is a sentence that is sufficient but not greater than necessary to meet the goals of sentencing and is in-line with others at the lowest end of the spectrum who have received probation for the same offense.

### Jason Hyland's Participation on January 6th

Mr. Hyland flew from Texas to Manassas Virginia on January 5, 2021 to attend the January 6 rally on the Ellipse.  He invited Facebook friends, Jennifer Leigh Ryan and Katherine Staveley Schwab and two other individuals to fly with him.  He could not, and did not foresee the unprecedented events of January 6th or their aftermath. On the morning of January 6, the group walked from their District of Columbia hotel to the rally on the Ellipse.  During  that  walk, codefendant Ryan broadcast over Facebook Live that the day was a "prelude to war."  (PSR, ¶ 21).  At the time Ms. Ryan was broadcasting, Mr. Hyland was recorded by Ryan walking 15-20 feet ahead of her, talking with another member of

their group and was well out of range to hear her predictions.



When the morning rally on the Ellipse concluded, the group walked to the west side of the Capitol but saw no signs of an organized event and returned to their hotel.  In the hotel room, Ryan and Schwab watched news coverage of rioters confronting police and attempting to breach the Capitol.  PSR, ¶ 22.  A recording from Ryan's cell phone shows Mr. Hyland  lying in bed, looking at his cell phone while the news program was playing and Ms. Ryan was recording herself reacting to the news coverage.   At no point is Mr. Hyland seen reacting to the news broadcast or to Ms. Ryan's commentary.



The screen shot (14 seconds into the video) is the only time Mr. Hyland appears in the recording.

At approximately 2:27 p.m., Hyland, Ryan and Schwab received a group text message from another member of their group forwarding a tweet that described rioters breaching the security barriers and actively destroying and occupying the Capitol building.  PSR ¶ 22.



The next text message that Mr. Hyland received was sent 10 minutes after the group text message containing the forwarded tweet was sent, and was read at 1:37:39 PM(UTC-6).



Mr. Hyland does not recall reading the forwarded tweet or hearing it discussed. The next text message Mr. Hyland received was read at 1:49:22 PM (UTC-6).  The missing time stamp on the text containing the forwarded tweet suggests that he may have simply scrolled through the message.

Mr. Hyland went to the Capitol because he wanted "it to register in a lot of people's minds that there were a lot of people that support this guy."  See  PSR, ¶ 23.  He  admitted to the FBI that when he arrived at the Capitol, he saw large crowds of Trump supporters had overtaken the Capitol grounds and were making their way into the building and that he wanted to "show a sheer number of support of people for President Trump."   PSR, ¶23.

At approximately 3:21 p.m., Mr. Hyland and Ryan entered the Capitol together through the Capitol Plaza East door.  Mr. Hyland recorded his entry on his cell phone. The  video recording shows that as he entered the building, he passed doors with visibly broken door windows and that building alarms were sounding.  Soon after he entered the Capitol, CCTV surveillance shows him recording video footage on his cell phone from a short distance inside the building — as far inside as he went.  At least one exiting member of the mob can be heard on the video recording commenting about tear gas.

At approximately 3:23 p.m., Mr. Hyland and Ryan left the Capitol through the same doors they entered.  PSR, ¶ 25.  Surveillance footage shows Mr. Hyland turning and pushing his way back out of the building after he pointed to a physical altercation between law enforcement officers and other rioters on the opposite side of the room.  Mr. Hyland was inside the Capitol for approximately 2-3 minutes.

















Mr. Hyland and Ryan remained outside of the Capitol. They reunited with Schwab and continued to make recordings, take photographs, and observe other members of the mob. After leaving the Capitol, Mr. Hyland made three short video recordings of himself. In one of those

videos, he stated, "They're coming for taxpayers like me who pay over half a million dollars a year in taxes; I just entered this f'u'**ing house because I own part of it. We're not gonna quit; you can't steal elections from us." PSR, ¶ 27.  Mr. Hyland also recorded himself saying that he had been gassed.  There is no evidence that he shared the self-styled videos.

Before leaving the Capitol grounds, Schwab and Ryan arrived at a press enclosure where the crowd was destroying media equipment.  PSR, ¶ 28.



Video footage showed Mr. Hyland joining Ryan at the media enclosure and walking away from Ryan roughly 4 seconds later.







Schwab was recorded kicking the broken media equipment and throwing one piece of broken equipment on the ground while Mr. Hyland and Ryan stood in the area of the enclosure.  PSR, ¶ 28.

On January 7, 2021, Mr. Hyland and the rest of his group flew back to Texas.  Later that day, Ryan messaged Mr. Hyland and her other travel companions that she was receiving threats and other hostile reactions to her posts and broadcasts from January 6.  Mr. Hyland responded with a message stating: "We did not commit violence or destruct property. I'm hoping my generosity for the plane ride doesn't backfire.  Y'all stop talking to people about it.  Completely.  And delete all of your related social media posts.  Especially if I'm in them.  Appreciate it in advance and I hope to see you all again when the dust settles."  PSR, ¶ 29.  Mr. Hyland posted no social media messaging or public online commentary before, during, or after January 6 and wanted no part of Ryan's incendiary messaging.

After learning that federal agents were questioning Schwab, Mr. Hyland contacted the FBI through counsel and was interviewed on January 19, 2021.  PSR,  ¶ 30.  Mr. Hyland admitted that he, Schwab, and Ryan entered the Capitol on January 6.  He described the walk

up the steps to the Capitol as a "funnel." He recalled that two police officers were standing at either side of the open doors.  According to Mr. Hyland, he asked if he could go inside; an officer responded "everyone else is."





Mr. Hyland told the FBI that when he entered the Capitol he felt something was not right and pushed his way out when he heard what sounded like a flash bang. Mr. Hyland estimated that his time inside the Capitol was less than a minute.  PSR, ¶ 31.  He also told the agents that he made two mistakes: first, that he invited people he didn't know, and second, "then [he] stepped foot inside the building." He also said he wasn't proud of what he did and that he didn't know why he did it, but that he "loved our country and hates violence."  At the end of the recorded interview, one of the agents told him that he would let prosecutors in Washington, D.C. know that he was "very cooperative" and "forthcoming."

### Jason Hyland's History and Personal Characteristics

The Presentence Report contains a comprehensive and discerning recitation of Mr. Hyland's personal history, family circumstances,[1] and work history which from which the Court can glean his love of family, work and service.  His commitment to service began in his senior year of high school when he was elected to serve as the American Legion, Boys State page to then Lt. Governor Amy Tuck and founded a community-based service organization for teens in Oxford, Mississippi.  The program included health and disaster services, needly relief, child development and elderly care, including an "Adopt-A-Grandparent" program.  See Letter from Vicky Tindall and news articles published in the Daily Mississippian, attached at Exhibit 1.

Mr. Hyland's employment history is similarly notable for his entrepreneurial ambitions, appreciation of the value of hard work and perseverance in the face of adversity.  When Mr. Hyland was 22 years old, he purchased a 100-acre tree farm nursery.  After investing in a new irrigation system, the 2008 recession hit, all his orders were cancelled and the business failed.

---

[1] As recounted in the PRS, Mr. Hyland grew up a victim of physical and emotional abuse from his father who since he became addition-free, Mr. Hyland has helped care for. PSR ¶¶ 47, 52.

In 2007, Mr. Hyland started a second business called Hyland Media Company that specialized in trade shows.  In 2012, his business partner locked him out of the business forcing him into litigation and bankruptcy.  From May 2012 until July 2017, Mr. Hyland was employed as a realtor and rose to one of the top three realtors in the company.  He left in December 2017 to start Reclaim Construction, LLC with his current business partner in Lewisville Texas. Reclaim Construction is a commercial general contractor specializing in catastrophic restorations and commercial renovations.  The company employs 20 office workers and has roughly 100 employees who work in the field.

Mr. Hyland divorced in 2015.  His ex-wife conveyed her belief that Mr. Hyland "would do anything for his children," describing him as a "fantastic" dad and someone who "lives" for his children and is always there for them.  PSR ¶ 55.  Those qualities, amplified in letters from family members and his business partner, are closely matched by his love of country and enduring belief in our democratic system of government—values he admits he briefly betrayed on January 6.

Mr. Hyland's business partner, Adam Cavrell, described his relationships with his family, stating:

> "Jason lives for his two children, ▮▮▮ and ▮▮▮▮.  There is nothing that matters more to Jason than his kids.  ▮▮▮, his son, is as respectful, smart soccer star in the making and ▮▮▮▮ is a kind, smart, respectful and caring daughter.  He raised them with that southern charm.  They light up the office when he brings them to work.  You can clearly see the love they have for one another.

> "Jason financially supports most of his family back home in Mississippi.  What I find interesting is that he is never upset about it  or complains.  When I question if this weighs on him, he tells me 'It all comes back around if you do the right thing, family first.'  Jason keeps in close contact with all of his family members, even if we are stepping into a meeting, he will always answer his kids, mom, dad, grandmother, no questions asked."

Letter from Adam Cavrell, Exhibit 2.

Mr. Hyland's grandmother says more about his values and pride in this country, including his decision to enter the Capitol, explaining:

> "I understand he has pled guilty of entering the Capitol on January 6, and he has great remorse for doing so.  I firmly believe in my heart Jason never realized the impact this action would have on his life and the lives of others there at the time.  Jason has a very deep love for our great country and its values and laws.  I firmly believe he is sorry for this action, and he never meant to cause harm or disrespect in any way.

> "Jason has always been very proud of our great country which is evidenced beginning at an early age when he became a member of the Lafayette High School ROTC.  Jason also worked with The Oxford Senate, an organization which helped youngsters learn about our great country and our many freedoms afforded by many years of sacrifice for those individuals who fought and died for our great country to remain free and independent.  He worked hard to help other young people realize their freedom was not actually free.  His belief in God, love for his country and his family, and his upstanding core beliefs are all instilled in his character and have been since he was very young."

Letter from Patricia Hyland, Exhibit 3.

Similarly, Mr. Hyland's grandfather writes:

> "Jason is a proud American who works very hard to provide for his children and his family.  He is an exceptional dad to ▮▮▮ and ▮▮▮, his young children, being sure they get their education and hands on with all of their extra activities, from cheer to soccer.

> "Jason has made sure his children know how much our freedom and independence mean to us as Americans.  He works hard to keep his successful business going and realizes this could not be possible if we did not live in the greatest country of all."

Letter from W.L. Hyland, Jr., Exhibit 4.

Likewise, Mr. Hyland's great grandfather explains:

> "He made a mistake by entering the Capitol building and is very sorry.  Jason loves his country and is very proud to be an American.  He would never do anything to intentionally cause harm.  He has suffered greatly during this process, having much regret and remorse from being at the Capitol."

Letter from Milton E. Lamons, Exhibit 5.

Mr. Hyland's own words best illustrate the depth and sincerity of his remorse:

"I have come to believe that January 6 was one of the worst days of my life.  I am shaken by the realization that I traveled from Texas to Washington to attend a rally that motivated me to become part of a crowd that threatened the lives of elected officials and law enforcement officers and the peaceful transition of our government. I do not condone or excuse my own conduct, or the behavior of any of the other people who, like me, entered the Capitol and interfered with the extremely difficult and dangerous jobs that the police forces had that day. I still struggle to understand how I allowed myself to be emboldened by the actions of others to engage in behavior that I consider abhorrent.  I take full responsibility for my conduct and the harm my actions caused to the dedicated government servants working inside the Capitol and to the entire country.  I am ashamed that I have put myself in a position that requires me to convince others that my actions that day do not reflect the values I have held my entire life and that I have worked very hard to teach my children."  PSR ¶ 35.

While his brief foray into the Capitol and his presence on the Capitol grounds cannot be condoned, Mr. Hyland has given this Court no reason to suspect that his conduct was other than aberrant behavior in the midst of an unprecedented political maelstrom.

### Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence and Protection of the Public

Mr. Hyland stands before this Court guilty of a misdemeanor offense.  He was among the first to acknowledge to the FBI that it was a crime with far-reaching implications for the nation. Mr. Hyland has no criminal record.  He has given this Court no reason to doubt that he will faithfully comply with the law in the future and no reason to fear that he will suffer a similar failure of judgment.

As the government has oft repeated, "the violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  Nevertheless, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings...."  *Gall v. United*

*States*, 552 U.S. 38, 52 (2007).  The damage Mr. Hyland caused is in-line with others at the lowest end of the spectrum who have received probation for the same offense.  For the same reasons, a sentence of 12 months' probation without home detention is all that is necessary to deter crime generally, and to protect the public from further crimes by Mr. Hyland.  See 18 U.S.C. § 3553(a)(2)(B)and (C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

The government has previously argued that in determining a fair and just sentence, the Court should assess a defendant's conduct against a spectrum of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  See e.g., *United States v. Jacob Lewis*, 1:21-cr-100, Dkt. 36, pp. 4-5.

Mr. Hyland entered the building through a tightly packed crowd.  He traveled no more than 10 feet into the Capital Plaza East entrance and remained inside the building for approximately 2-3 minutes.



Mr. Hyland did not see the noose or scaffolding on the West side of building.  He did not prepare for or encourage acts of violence or destruction of property and did not celebrate any form of violence or destruction of property.  He was shown on video surveillance standing just inside the Capitol Plaza East entrance to the building recording video footage and exiting immediately after pointing to a physical altercation between officers and rioters on the opposite side of the room. The is no evidence he was given or disregarded commands by law enforcement officials either inside the Capitol building or while present on the Capitol grounds.  While back outside the Capitol, Mr. Hyland recorded a short video of himself claiming that as tax payer, he owned part of the Capitol building.  He made no statements on social media and did not publicly attempt to defend his actions.  Mr. Hyland was also among the first who agreed to be interviewed by the FBI.  He admitted knowing that he did not have permission to enter the Capitol and accepted full responsibility for his conduct.  He has also demonstrated early and sincere remorse, placing him on the lowest end of the spectrum for punishment.

Despite the divide that exists across the country, sending Mr. Hyland to prison or imposing a sentence that includes home detention is not an effective way to achieve general deterrence.  According to the National Institute of Justice, "the certainty of being caught is a vastly more powerful deterrent than the punishment."  U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things about Deterrence*, May 2016, NCJ 247350, available at OJP.gov/pdffiles/nij/247350.pdf.  Research has found evidence that prison can exacerbate, not reduce, recidivism:

> "… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Id.*, at 2, also attached as Exhibit 6.  A sentence of 12 months' probation, a fine of up to $5000, $500 of restitution and 30 hours of community service is sufficient but not greater than necessary to achieve the goals of sentencing.

### Avoiding Unnecessary Sentencing Disparities

As of the date of this sentencing memorandum, by Mr. Hyland's count,  this Court has sentenced three defendants for convictions under 40 U.S.C. § 5104(e)(2)(G) to terms of 12 and 24 months' probation without periods of home detention.  At least one played a materially greater role than Mr. Hyland.  None had mitigating factors that are not also present here.

In *United States v. Julia Sizer*, 1:21-CR-621, this Court sentenced the defendant to 12 months' probation, a $2,000 fine and $500 of restitution.  Dkt. 31, p. 5.  Sizer engaged in the following conduct:

- Entered the Capitol at approximately 2:48 p.m. through Parliamentarian Door which had been previously breached by other rioters.

- Recorded video on her cellular phone as she entered the building. One video showed a tightly packed crowd of rioters moving through the Parliamentarian Door shouting "USA! USA!"

- Other video paned outside the Capitol building, depicting scores of rioters who had overwhelmed law enforcement on the West Side of the building. Alarms could also be heard blaring in the background as the defendant enters the building.

- CCTV showed Sizer exiting the Capitol approximately two minutes after she entered through the same door she entered.

- Sent the video she recorded of her entry to 6 people.  When initially contacted by the FBI, falsely stated that she did not enter the Capitol building.

- Admitted deleting some photos and/or video at the Capitol to get rid of evidence.

*United States v. Sizer*, Dkt. 26, pp. 2-7.

On April 18, 2022, the Court sentenced the defendant in *United States v. Jacob Lewis*, 1:21-CR-100 to 24 months' probation, a $3,000 fine, 30 hours of community service and $500 of restitution.  Dkt. 40, pp. 2, 4, 5.  Lewis engaged in the following conduct:

- Entered the Capitol at approximately 2:55 p.m. through Senate Wing Doors into an area with hundreds of people, then made his way to the Crypt area.

- Went through the Memorial Door, walked past the House Wing Door and traveled through the Hall of Columns at approximately 3:02 and left the building moments later.

- Told a tipster who saw pictures of the Capitol on Lewis' Instagram account that: "None of them are going to make it to the White House. Watch what's going to happen in the next ten days."

- When interviewed by the FBI, gave the agents access to his Instagram account. He told the agents that because of what happened on January 6, he did not think the Inauguration would happen on January 20 and when it did happen, it would not go smoothly.

*United States v. Lewis*, Dkt. 36, pp. 5-10.

On April 18, 2022, this Court also sentenced the defendant in *United States v.*

*Timothy O'Malley,* 1:21-CR-704 to 24 months' probation, 20 hours of community service

and $500 restitution.  Dkt. 36, pp. 2, 4, 5.  O'Malley engaged in the following conduct:

- Prepared for violence by bringing a softball helmet with full facemask to Washington, D.C.

- Entered the Capitol at approximately 2:51 p.m. through the Parliamentarian's door, made his way through the Brumidi corridors to a staircase on the north side of the Capitol that took him to the second floor and the Senate Reception Room, a room in the immediate vicinity of the Senate Chamber.

- Was at the front of a group of rioters who overwhelmed a line of officers in the Brumidi Corridors.

- Filmed himself in the Senate Reception room yelling: "We took the Capitol. We're moving on to other floors now.  Whoo! Our house."

- Continued to shout "We fought our way.  All the way in there" after leaving the Capitol building

- Filmed another video outside the Capitol yelling: "Our house! Take it back."

- Sent text and media messages to two individuals.

- Has a history of felony and misdemeanor convictions.

*United States v. O'Malley*, Dkt. 30, pp. 1-2.

## Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing

these factors, a sentence of 12 months' probation, a fine of up to $5,000, 30 hours of

community service, and restitution of $500 would protect the community, promote respect for

the law, and deter future crime by imposing consequences for My Hyland's behavior while

recognizing his early acceptance of responsibility.  It would also achieve a degree of

uniformity in the sentences imposed.

Respectfully submitted,

JASON LEE HYLAND
By Counsel

/s/ Nina J. Ginsberg
Nina J. Ginsberg, Esquire
DiMuroGinsberg, P.C.
D.C. Bar No. 251496
1101 King Street, Suite 610
Alexandria, VA  22314
Phone: 703-684-4333
Fax: 703-548-3181
Email: nginsberg@dimuro.com

## CERTIFICATE OF SERVICE

I hereby certify on this 26th day of July, 2022, a true and accurate of the foregoing was served on all counsel of record via the Court's Electronic Filing System.

I further certify that a copy was also sent by e-mail to Hana Field, Probation Officer, at hana_field@dcp.uscourts.gov.

/s/ Nina J. Ginsberg
*Counsel for Jason Lee Hyland*