**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00050-002 (CRC)** |
| **v.** | : | |
| | : | |
| **JASON LEE HYLAND,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jason Lee Hyland to 30 days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

**I.       Introduction**

Hyland and his two codefendants[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 in losses.[2]

---

[1] Hyland was jointly charged in this case with Jennifer Leigh Ryan ("Ryan") and Katherine Staveley Schwab ("Schwab"). Following her plea of guilty, ECF 38, 39, this Court sentenced Ryan to 60 days' incarceration, a special assessment of $10, and restitution in the amount of $500. ECF 56. Defendant Schwab is scheduled for a change of plea on August 18, 2022; *see* Minute Order of June 22, 2022.

[2] Estimated loss amounts have been revised since defendant Hyland's change of plea. *Cf.* ECF 65:6. As of April 5, 2022, the approximate amount of losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On March 28, 2022, Hyland pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. ECF 65, 66; PreSentence Investigation Report ("PSR") ¶ 9.  As explained herein, a sentence of 30 days' incarceration and 36 months' probation is appropriate in this case because: (1) Hyland anticipated and prepared for potential for violence on January 6, 2021; (2) he chose to join the crowd at the Capitol after learning that it was the site of ongoing violence; (3)  when entering the Capitol, Hyland could see broken windows and hear blaring alarms; (4) immediately after exiting the Capitol building, Hyland recorded a videos of himself declaring that his participation in the riot was justified because he was a "taxpayer" who "owned" the Capitol Building and complained about the police using non-lethal force to disperse the rioters; (5) after Hyland exited from the Capitol Building, he observed and recorded video on his mobile telephone of police officers struggling to disperse the crowd; (6) Hyland and his codefendant Schwab shouted epithets at the officers who were valiantly trying to protect the Capitol and its lawful occupants, calling them "traitors" and thereby possibly inflaming the crowd; ; (7) before leaving the area,  Hyland observed one of his codefendants attempt to destroy media equipment in a press enclosure; (7) he instructed his codefendants to delete digital evidence of their involvement; and (8) he lied to the FBI that he did not observe violence on January 6.

The Court must also consider that Hyland's conduct on January 6, like the conduct of hundreds of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to substantially delay the certification vote. *See, e.g., United States v. Jesus D. Rivera,* No. No. 21-cr-60-CKK, --- F. Supp. 3d ---, 2022 WL 2187851 at *6 (D.D.C. June 17, 2022)("Even the presence of *one* unauthorized person is

reason to suspend Congressional proceedings … Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption")(statement of Judge Kollar-Kotelly)(original emphasis); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).   Here, Hyland's participation in a riot that actually succeeded in halting the Congressional certification combined with his anticipation and then actual knowledge of violence call for a short sentence of incarceration.

## II.        Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 66 (Statement of Offense), at 1-6; PSR), ¶¶ 13-19. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Hyland's conduct and behavior relevant to January 6.

### Hyland's Role in the January 6, 2021 Attack on the Capitol

Hyland invited members of his social circle to travel with him from Texas to Washington, D.C. to attend the Save America rally on January 6, 2021.  After those invitations were declined, Hyland invited two of his Facebook friends, (his codefendants), who accepted his offer to fly to Washington for the rally in Hyland's private aircraft and suggested that they each invite someone to join the group, which they did. ECF 66:3; PSR ¶ 20. The group that agreed to travel with Hyland consisted of Ryan, Schwab, and two others who have not been charged.

By January 4, 2021, Hyland and his group were exchanging text messages about arrangements for the trip. Hyland received a group text from Schwab on January 4, 2021 asking "Are we going to conceal carry (tho not legal there) as a just in case for protection?" Government Exhibit (GX) 1, attached.

To the group, defendant responded:

> I have no knowledge on that. Whatever the law dictates - we will do. But if someone did carry on my plane, I would expect that you unload it at home and keep it out of sight from my staff and FBO[3] operators. If someone carries, that person is responsible for any actions that could be faced.

*Id*.

Later that day, in response to a message from Schwab, (who asked, "So excited for this! What protective measure are we doing? I agree with covering our faces") Hyland texted:

> I'm carrying a pocket knife. Seems to be strict on guns with the national guard being called I plan to meet up with the patriot party and kinda stick with them … Unless I run into more Texas folks. But being in a group seems to be very important.

GX 2, attached. Schwab then replied that a friend with government employment advised "for us to leave our guns at home." *Id*. An uncharged participant offered to provide the group with "bulleproof backpacks" so "everyone would have an extra level of protection, just in case." GX 3, 4, attached. Hyland accepted this offer. GX 3. On January 5, Hyland flew with his group from Texas to a Manassas, Virginia airport and then checked into a District of Columbia hotel. PSR ¶ 20.

On January 6, the group left their hotel at 7 a.m. to walk to the Ellipse to attend the rally. For at least 20 minutes, Ryan livestreamed the walk to the rally on Facebook and repeatedly

---

[3] In the aviation context, FBO is an abbreviation for "fixed base operators" who provide services for aircraft.

characterized the day as a prelude to war.  PSR ¶ 21; ECF 66:3. In the screenshot below, from Ryan's video of that walk, also attached as GX 4-A, Hyland appears within earshot of Ryan as she comments about a prelude to war:



GX 4-A (Ryan video of walk to rally at 5:28-32 minute mark).

After the rally, Hyland and his group began to walk to the Capitol. PSR ¶ 22; ECF 66:4. After reaching the area near Fourth Street and Pennsylvania Avenue, NW, four members of the

group, including Hyland, decided to abandon plans to reach the Capitol and return to their hotel instead. The fifth individual decided to proceed to the Capitol. *Id*.

While at the hotel, in a room with Hyland and Schwab, Ryan recorded herself and her codefendants as news programs broadcast images of rioters breaching the Capitol. *Id*. In this recording, created on January 6 at 2:20 p.m., *see* ECF 51-1, Ryan exclaimed loudly and repeatedly over the broadcast that "They're climbing the walls at the Capitol!" Approximately 14-15 seconds into the recording, defendant Hyland appears briefly while looking at a phone. Referring to the Capitol, and in Hyland's presence, Ryan also declares: "We're gonna go down there. And were gonna sit in those – we're gonna go move them outta their chairs. We're going down there. Because we've had it. We're not here to play around." Screenshots showing an image from the broadcast and an image of Hyland (below a red arrow) in the hotel room where the broadcast was playing are shown below and also attached as GX 5:





At 2:27 p.m., a person in Hyland's group sent Hyland and others a text that forwarded a tweet describing the violence at the Capitol. ECF 51-2, 51-4. The tweet included an image of the riot and reported:

> BREAKING: Trump supporters have breached all security barriers and are now actively destroying and occupying the Capitol building
>
> I repeat. The Feds have lost control of the Capitol building
>
> Revolution in progress

Not a drill

…

BREAKING: Trump supporters have breached the Capitol building, tearing down 4 layers of security fencing and are attempting to occupy the building – fighting federal police who are overrun

This is the craziest thing I've ever seen in my life.  Thousands, police can't stop them



Approximately ten minutes later, Hyland, Schwab and Ryan left their hotel for the Capitol.[4]

They approached the building's East Front, made their way through the crowd and up steps to the

---

[4] At approximately 2:37 p.m., Ryan sent a group text message, attached as GX 6, to the individual who decided to continue to the Capitol rather than return to the hotel.  The message, which was also sent to Hyland and to Schwab, stated "We're on our way [name of person already at the Capitol]."  This message was also recovered from defendant Hyland's phone.

East Rotunda doors.  Schwab was the first to arrive at the doors ahead of Hyland and Ryan. ECF
66:4; PSR ¶ 24.  She stood at the front of a crowd that surged into the building, pushing past
Capitol police officers in the doorway.  Hyland and Ryan were behind Schwab and were not part
of this surge.  The surveillance photo below shows Hyland above the red arrow as he approaches
the doorway, and Schwab and the bottom of the picture to the left of a yellow arrow.[5]



Hyland and Ryan followed Schwab into the Capitol as they each recorded their entry at
3:21 p.m., while broken glass was visible and alarms were blaring.  Hyland wanted to "show a
sheer number of support of people for President Trump" and wanted "it to register in a lot of
people's minds that there were a lot of people that support this guy." Hyland's cellular phone
recording of his entry into the Capitol shows that he passed through doors with broken windows

---

[5] The United States will seek to produce the  surveillance recording which the above photo comes
from and other recordings referenced in this memorandum to this Court and defense counsel
separately.

while building alarms were sounding.  The screenshot below, also attached as GX 7, showing one such broken window comes from one of Hyland's cellular phone recordings.



About five seconds after Hyland crossed the threshold into the Capitol, his phone recorded the sound of Ryan's voice mentioning tear gas.  After recording himself and Ryan talking about Schwab's possible location, Hyland recorded another rioter who was exiting the Capitol while wearing a combat helmet and goggles, and who stated, "I've been fighting for the last hour and a half."   The first of two images below is a screenshot from a recording from Hyland's cellular phone of his entry into the Capitol; the second screenshot is from an online recording posted by the Daily Mail.  GX 8 and 9, also attached.





In the image above, defendant Hyland is under the red arrow; Ryan's face, mostly obscured by the head of another rioter wearing a helmet, appears within the red circle.

Surveillance footage also recorded Hyland's entry into the Capitol, and documents that he left the building at approximately 3:23 p.m., after remaining inside for about 90 seconds.  Once he exited, Hyland recorded himself by the Capitol steps stating, "They're coming for taxpayers like me who pay over half a million dollars a year in taxes; I just entered this f***ing house because I own part of it.  We're not gonna quit; you can't steal elections from us." A screen shot from that recording, also attached as GX 10, is below:



At 3:56 p.m., Hyland filmed himself in the area of the East Front, taking offense at Capitol police and exclaiming, "They're shooting pellets at f***ing taxpayers" and "They're shooting pellets and tear gas every f***ing where."  A minute later, Hyland created another video of himself where he announces "So they gassed me."  Hyland nevertheless remained on the Capitol grounds despite police efforts to disperse the crowd, and made his way to the north side of the building.

By approximately 4:35, Hyland had reconnected with Schwab outside the Capitol's North Door.[6]  From that vantage, he recorded a group of officers attempting to push the crowd away from the building.  This video also recorded Hyland and Schwab as they shouted insults at officers, including calling them traitors.

Before leaving the Capitol grounds, Hyland, Ryan and Schwab entered a media enclosure where a mob was attempting to destroy press equipment.  Hyland, Ryan, and Schwab all watched the attack.  *See* ECF 51-4 (reproduced below with an arrow indicating Hyland):



 Ryan and Schwab shouted insults about the media while the attack was underway, and Schwab joined the attack, kicking media equipment and throwing one piece of equipment on the ground while Hyland and Ryan looked on. After the media attack, the defendants returned to the hotel where they celebrated the breach of the Capitol.

---

[6] Unlike her two codefendants, after entering the building, Schwab was able to enter the Rotunda soon after Capitol and Metropolitan police were concluding efforts to remove a large crowd from that area.  Because Schwab and others who entered the Rotunda at roughly the same time agreed to leave without resistance, police escorted them out of the building through an exit on the Capitol's north side.

On January 7, 2021, the group returned to Texas in Hyland's plane.  ECF 66:5; PSR ¶ 29.

Thereafter, Ryan in particular and other members of the group encountered a substantial and

negative backlash over social media.  Hyland responded by texting his group:

> We did not commit violence or destruct property.  I'm hoping my generosity for
> the plane ride doesn't backfire.  Y'all stop talking to people about it.  Completely.
> And delete all of your related social media posts.  Especially if I'm in them.
> Appreciate it in advance and I hope to see you all again when the dust settles.

 GX 11, attached.  A few minutes later he added "Did nothing wrong but these people will twist

anything you say or show to blame you.  They are masters at it [.]"  GX 13, attached.

On January 15, 2021, FBI agents interviewed Schwab at her home.  Hyland was able to

surreptitiously listen to the interview over Schwab's cellular telephone. GX 12, attached. After the

Schwab interview, Hyland arranged through counsel to schedule his own interview with the FBI.

During his recorded January 19, 2021 interview, Hyland contended he thought that two

rallies were scheduled for January 6, one in the morning near the Washington Monument, and

another at 1:00 p.m. at the Capitol.  According to Hyland, after he left the morning rally, there was

no evidence of a second rally at the Capitol, so Hyland and three members of his group returned

to their hotel.  Hyland stated that the group then left the hotel to return to the Capitol to look for

the 1:00 p.m. rally on the other side of the building.  Hyland falsely told the FBI that before leaving

his hotel, he did not know what was happening at the Capitol, and that when he arrived at the

Capitol, he had not seen "the craziness on TV" but it was crazy when he arrived.   He said that he

made two mistakes relating to January 6.  One was inviting people that he did not know to join

him, and the other was setting foot inside the Capitol.   According to Hyland, once he arrived on

the Capitol steps there was a "funnel effect" and he had to fight not to go in.  He falsely claimed

he saw no violence, contending "that would have scared me."

Hyland also claimed that he saw two U.S. Capitol police holding the doors to the building open, and when Hyland asked them if he could enter, he received the response that "everybody else is."  A screen shot from surveillance footage showing the moment of Hyland's entry appears below:



Hyland appears above under a red arrow and behind Ryan, with his face obscured by his cellular phone.  At the moment of his entry, the entrance is flanked by Capitol police officers who are not holding doors open.  Hyland appears to be recording in this image, which does not show any indication of the crowd forcing him inside.

Hyland stated that he entered the Capitol, felt that something was not right, partly from the way the officer answered his question about entry, and then pushed his way out of the Capitol after hearing a flash bang.  He acknowledged seeing clouds of tear gas.  Hyland identified a photograph of himself and denied that there were any weapons on his plane.   He said the backpack provided by one of his travelling companions was "tactical" but he could not remember in what way.

During the interview, Hyland expressed regret for going to the Capitol.  Two days later, he consented to a search of his cellular telephone and provided the FBI with the password for the phone.

*The Charges and Plea Agreement*

On January 28, 2021, Hyland was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 8. On February 2, 2021, Hyland self-surrendered to FBI agents in the Eastern District of Texas and was placed under arrest. ECF 22:12. He was charged in a four-count Superseding Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 18.[7] On March 28, 2022, he pleaded guilty to Count Four of the Superseding Information, charging him with parading, picketing and demonstrating in the Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). ECF 65, 66. In his Plea Agreement, Hyland agreed to pay $500 in restitution to the Architect of the Capitol.  PSR ¶ 129; ECF 65:6.

**III.  Statutory Penalties**

Hyland now faces a sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Hyland faces up to six months of imprisonment and a fine of up to $5,000.  PSR ¶¶ 127, 129. Hyland must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C.  § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9; PSR ¶ 128.

**IV. Sentencing Factors Under 18 U.S.C. § 3553(a)**

---

[7] The information was superseded again to add an additional count charging Schwab; the charges against Hyland remained the same.  ECF 34.

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a) which identifies the factors a court must consider in formulating a sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the government's recommendation: 30 days' incarceration, 36 months' probation, 60 hours' community service, and a $500 restitution payment.

### A.    The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with police officers and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Hyland's individual conduct, this Court, in determining a fair and just sentence,  should look to a number of critical factors, to include: (1) whether, when,

how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Hyland personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Hyland's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Hyland from most other misdemeanor defendants. Hyland's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

Regardless of his later protests to the contrary, Hyland anticipated violence on January 6 before he traveled. He was the first person in his group to receive a text offering the use of "bulletproof" backpacks that Hyland described as "awesome." He was then included in a group text offering his associates backpacks described again as "bulletproof" to provide "an extra level of protection." He exchanged messages with a codefendant about what protective measures would be necessary on January 6 and discussed bringing weapons to the District of Columbia. While giving lip service to stricter firearm prohibitions in this district, Hyland unambiguously agreed to look the other way if his companions decided to fly with guns as long as they did so discretely.

He felt enough concern about potential violence that he found it "very important" to be part of a group while attending a rally.

Moreover, Hyland left his hotel for the Capitol with notice that his presence was unwelcome and unlawful and that a violent attack was underway. Minutes before leaving, Hyland had been in a small hotel room during a network television broadcast covering rioters as they breached the Capitol, while his codefendant shouted about rioters climbing the walls of the building. Approximately ten minutes before leaving the hotel for the Capitol, Hyland and his group received a text message forwarding news that rioters had breached security barriers, were occupying the Capitol, and were fighting with and overwhelming police. None of this information deterred Hyland or his group from advancing to the Capitol.

After arriving on the Capitol grounds, Hyland approached the building's East Front as the crowd chanted "USA!" and "Let us in!" As they recorded video on their mobile telephones, Hyland and Ryan entered the Capitol while alarms blared, crossing doors with broken glass in their windows.[8] Ryan observed tear gas as they entered. An exiting member of the crowd in goggles and a combat helmet looked into Hyland's telephone camera to say that he had been fighting for an hour and a half. If the television news and the text message he had received were not warning enough, the shouts to "Let us in," the alarms, and the broken windows in the entrance doors were red flags which Hyland should have heeded, even if his presence inside the Capitol was brief.

After exiting from the Capitol, Hyland reconnected with Schwab and an uncharged member of the group on the north side of the Capitol. There, Hyland recorded Metropolitan police officers attempting to push the crowd away from the building. Once outside, Hyland showed no

---

[8] In contrast to what he told the FBI, neither the defendant's recording nor Ryan's shows any police officer holding the entrance doors open, and neither video recorded the defendant asking an officer if he could enter the building or receiving a response that 'everybody else is.'

remorse for his entry. Instead, he expressed outrage in other recordings at police efforts to disperse "taxpayers" with pellets; invoked his own payment of over $500,000 in taxes to justify his presence inside the Capitol; and maintained, with reference to the false claim of a stolen election, that "we're not gonna quit." His recording of officers captured Hyland and Schwab insulting the police and shouting that they were "traitors." The video portrays an utterly different person from Hyland's self-portrait as someone who, according to Hyland, meekly sought permission to enter the Capitol and did so after receiving a passive, if not sarcastic, response from an officer. A screen shot from this video, GX 14, attached and included below, provides an image from Hyland's perspective as he yells that the police are "traitors" and "son of b****es."



His later conduct also speaks to the characteristics of Hyland, who stood by without objection and witnessed others, including defendant Schwab, destroy property in a media enclosure. The very next day, Hyland texted, "We did not commit violence or destruct property." GX 11. In his voluntary interview with the FBI, while expressing remorse for his actions, Hyland again denied witnessing any acts of violence.

In light of these facts, this Court can appropriately characterize Hyland's offense as a serious one and sentence him accordingly.

### B.  Hyland's History and Characteristics

Hyland is a high school graduate who attended college for approximately two years without receiving a degree. PSR ¶ 81. He has obtained licenses for real estate, commercial roofing, commercial driving, and for boating; he previously had a student pilot's license. PSR ¶84. He is the owner of a successful roofing and construction business. PSR ¶¶ 88-90. He is a divorced father of two children and is in a relationship with codefendant Schwab that appears to have started on January 6, 2021.  PSR ¶¶ 53- 56.  He has no significant criminal history.  PSR ¶¶ 38-44.

The PSR also contains a statement from Hyland expressing his remorse. PSR ¶ 35.  Hyland reports that he is "shaken" by his conduct on January 6, and does not seek to excuse it.  He describes his conduct on that date as "abhorrent" and "harmful," and expresses regret for his behavior towards the police.  These sentiments are factored into the recommendation stated in this memorandum and should be weighed against Hyland's denials of wrongdoing after January 6, his false denial of violence that he witnessed on that date, and his wishes for further action to overturn the election in the days that followed.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9] As with the nature and circumstances of the offense, this factor supports a

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

sentence with home detention, as it will in many misdemeanor cases arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

Oversight and Reform Committee (June 15, 2021), available at:
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing.)

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The facts of this case also reflect the need for specific deterrence. In Hyland's own words from January 6, "we're not gonna quit." Following the riot, Hyland maintained his group had done nothing wrong and falsely denied any member's participation in acts of violence or destruction of property. With assistance from counsel, Hyland was later cooperative with the FBI and admitted to his wrongful entry into the Capitol, but was less than fully truthful about acts of violence that he witnessed or his own expectation of potential violence.

On January 7, 2021, Hyland stated in a text message to Schwab that:

> We didn't do anything wrong.  But we aren't a rational patriotic country anymore.
> It's gone.

GX 15, attached.

On January 8, 2021, with another member of his group, Hyland expressed the sentiment that his actions at the Capitol would not provide any reason to worry were it not for public statements made by others (likely Ryan and a friend).  GX 16, attached.  In subsequent messages, Hyland acknowledged following certain conspiracy theories related to the 2020 presidential election; expressed the hope that they were "not all BS;" texted his frustration on January 11, 2021 that he "Just wished I saw some action. Seems like all words right now;" and sought proof that the "insurrection act was signed." *Id*. Statements by Hyland that his status as a taxpayer justified an unlawful entry into the Capitol during a riot, that he would never quit, that he did nothing wrong, and that he wanted action not just words in response to false claims of a stolen election support a sentence that promotes deterrence in his individual case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[10] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor

---

[10] Attached to this sentencing memorandum is a table, GX 17, providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[11] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Hyland has pleaded guilty to Count Four of the Superseding Information, charging him with parading, picketing, and demonstrating in the Capitol Building, a violation of 40 U.S.C.

---

[11]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

§ 5104(e)(2)(G) This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with police.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police

officers, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on codefendant Ryan for reference. Both Hyland and Ryan went to the Capitol with advance knowledge from television news and a text that it was the site of a violent and destructive riot. They entered the Capitol together, despite obvious signs that such entry was unwelcome and unlawful. They remained inside for the same amount of time, and after exiting, witnessed the same violence and destruction at a press enclosure without objection and apparent approval. In the days that followed, both maintained that they had done nothing wrong.

Significant differences, however, also emerge in any comparison between the two defendants. Ryan made false statements about January 6 and her own role in the Capitol breach to thousands of social media followers; she celebrated the events of that day and its violence, and in at least one posting, promoted additional violence. Hyland, in contrast, has essentially no social media presence, PSR ¶ 60, and did not promote false theories to a broad section of the public. Ryan had prior misdemeanor convictions, while Hyland does not. Ryan broadcast a shocking sense of impunity and publicly maintained that she would never be held accountable because of her appearance and status. Defendant Hyland has done nothing similar.

Significantly, Ryan never expressed remorse. She portrayed herself as a victim and never truly admitted to her own wrongdoing. She made statements to this Court that were not true and were not credible. Although defendant Hyland denied wrongdoing in the days that followed January 6, his statement to Probation is a striking contrast to anything Ryan ever provided. As

noted above, Hyland claims to be shaken by his conduct, describes it as "abhorrent" and harmful, and he attempts to recognize the harm he has caused others such as the police and elected officials. While any sentence imposed in this case should reflect the severity of Hyland's conduct, including the very real threat it posed to electoral processes and democratic norms, this Court can properly weigh Hyland's differences from his codefendant without creating disparity.  A lesser sentence than Ryan's is not inappropriate here.

While no previously sentenced case contains the same balance of aggravating and mitigating factors presented here, the Court may also consider the sentences imposed in the following cases.  Each involved a guilty plea like the one in this case to a violation of 40 US.C. § 5104(e)(2)(G).

In *United States v. Little*, 1-21-cr-315-RCL, ---F.Supp.3d---, 2022 WL 768685 (D.D.C. Mar. 14, 2022), the government recommended a sentence of 30 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution.  Little entered the Capitol despite witnessing police officers deploy tear gas and rubber bullets to disperse rioters.  He was not deterred from entering by the site of rioters scaling scaffolding or a family member's medical emergency.  Once inside the Capitol, Little entered the Senate Gallery.  He boasted about his activity during and after the attack and was not remorseful.  2022 WL 768684 at *2.  The Court imposed a sentence of 60 days' imprisonment, 36 months' probation, a $10 special assessment, and $500 in restitution.

In *United States v. Peterson*, 1-21-cr-309-ABJ, the government recommended a sentence of two weeks' incarceration and $500 in restitution.  Petersen attended the rally on the Ellipse with his family, who accompanied him to the Capitol afterwards.  His family left the Capitol grounds after detecting tear gas; Petersen did not.  On his approach to the Capitol Building, Petersen

witnessed rioters in physical and verbal confrontations with police, which did not deter him from eventually entering the building through a broken window near the Senate Wing door.  While inside the Capitol and after his departure from the building, Petersen bragged about his exploits. He remained unremorseful, and later lied to federal agents about witnessing violence.  He received a sentence of 30 days' incarceration, $500 in restitution, and a $10 special assessment.

In *United States v. Sorvisto*, 1-21-cr-320-ABJ, the government recommended a sentence of 30 days' incarceration and $500 in restitution.  Sorvisto was inside the Capitol for approximately 25 minutes; he later bragged about "tak[ing] this country back" in a text message, instructed friends to destroy a distinctive jacket that he wore throughout the Capitol, and instructed friends to delete pictures Sorvisto had sent them from his time inside the Capitol.  He received a sentence of 30 days' incarceration, a special assessment of $10, and restitution in the amount of $500.

In *United States v. Janet Buhler*, 1:21-CR-510-CKK, the government recommended a sentence of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.  Buhler entered the Capitol and the Senate gallery; cheered as rioters crushed police officers in the East Rotunda doors; and deleted photographs from her phone that documented her time inside the Capitol.  She entered the Capitol despite smoke clouding the West Front; the sound of alarms and flash bangs; the sight of rioters tearing down tarps and scaling walls and scaffolding, and broken glass on the floor of the entrance she used to access the building.  She received a sentence of 30 days' incarceration, 36 months' probation, a $10 special assessment, and $500 in restitution.

The foregoing cases are comparable so far as the defendants either confronted unmistakable evidence upon arrival at the Capitol that police were trying to disperse a violent mob, but chose to breach the building; and insofar as the defendants celebrated the breach but also made

efforts to conceal or destroy evidence of their participation with the mob.  Hyland, unlike the defendants described above, stands apart because like his codefendants, he chose to go to the Capitol with advance knowledge that it was the site of an ongoing violent riot which police were attempting to resist.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

To summarize, in this case defendant Hyland anticipated violence on January 6, considered bringing weapons to the District of Columbia, did bring "bulletproof" backpacks, and wanted the protection of a group for the events he planned to attend.  From television broadcasts and a text message, Hyland had explicit knowledge of an ongoing, violent riot that did not deter him from walking to and then breaching the Capitol.  Although Hyland entered the building for less than two minutes, after exiting, he attempted to justify his conduct with his status as a taxpayer and exclaimed that he would "never quit;" he was anything but remorseful in the days that followed. In his favor, Hyland did cooperate with federal agents, even if he was not completely truthful in

an interview, and he has provided a statement of remorse that is certainly more compelling than that of his sentenced codefendant. He lacks any significant criminal history and appears to have established and maintained a successful business.

**V.    This Court Has Authority To Impose A Sentence of Incarceration To Be Followed By A Term Of Probation In This Case.**

**A. This Court Has Authority To Impose A Split Sentence.**

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46, (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), Minute Order of July 22, 2022,   (D.D.C. July 12, 2022) (imposing split sentences)(judgment not yet recorded on the docket); *United States v. Blakely*, 21-cr-00356 (EGS),

Minute Order of July 14, 2022, (D.D.C. July 14, 2022)(judgment not yet recorded on the docket); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### 1. *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[12] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. §

---

[12] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

3551(b).[13]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

---

[13] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

## 2.   *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time

to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see Cyclopedia of Federal Procedure*, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state

"the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185.  "The 'specific provision'—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Hyland pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[14]

---

[14] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

2. *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[15]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical

---

[15] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

**Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. The government submits that this memorandum appropriately weighs the relevant statutory factors, and recommends that this Court sentence defendant Jason Lee Hyland to 30 days' incarceration, 36 months' probation; 60 hours of community service, and $500 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:   s/Karen Rochlin
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov